IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA SINGH                                    :
4627 Hale Court                               :
Ellicott City, Maryland 21043                 :
                                              :
        Plaintiff,                            :
                                              :
v.                                            :        Civil Case No.
                                              :
AARP                                          :
601 E Street, N.W.                            :
Washington, D.C.  20049                       :
                                              :
        Serve (Registered Agent):             :
                                              :
        CT Corporation System                 :
        1015 15th Street                       :
        Suite 1000                            :
        Washington, D.C.  20005               :
                                              :
and                                           :
                                              :
AQUENT LLC                                    :
501 Boylston Street                           :
Third Floor                                   :
Boston, Massachusetts  02116                  :
                                              :
        Serve (Registered Agent):             :
                                              :
        CT Corporation System                 :
        1015 15th Street                       :
        Suite 1000                            :
        Washington, D.C.  20005               :
                                              :
        Defendants.                           :

## **COMPLAINT**

Plaintiff Lisa Singh, by and through her counsel of record, hereby files her Complaint

against Defendants AARP and Aquent LLC for pregnancy discrimination and retaliation

pursuant to the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01, *et. seq.*

## PARTIES

1.    Plaintiff Lisa Singh ("Plaintiff") is an individual resident of the State of Maryland.

2.    Defendant AARP ("AARP") is a domestic non-profit corporation organized under the laws of the District of Columbia.  AARP maintains its principal place of business in the District of Columbia.

3.    Defendant Aquent LLC ("Aquent") is a foreign limited liability company organized under the laws of the State of Delaware.  Aquent maintains its principal place of business in the State of Massachusetts but is registered and conducts business in the District of Columbia.

## JURISDICTION AND VENUE

4.    The matter in controversy in this case exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.  This Court therefore has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332.

5.    All of the events giving rise to the claims asserted in this lawsuit occurred in this judicial district; accordingly, venue is proper herein pursuant to 28 U.S.C. § 1391.

## FACTS

6.    Plaintiff worked at AARP for three years, 11 months, when her contract was abruptly terminated March 30, 2018 following the disclosure of her pregnancy and less than 30 days after reassignment under a new department manager, Jodi Bettencourt ("Bettencourt"). Bettencourt previously managed Plaintiff at another company, Travel Channel, and similarly terminated Plaintiff in 2014, following a prior pregnancy disclosure.

7.      Plaintiff has a Master of Science degree in Journalism from Columbia University and has spent her entire career working as a journalist and writer for a number of large corporations, widely circulated publications and news organizations.  Plaintiff's work has been widely published in feature articles, essays, news articles, interviews and custom media content for national and regional publications and media outlets, including Bloomberg, The Washington Post, The Wall Street Journal, New York Magazine (online), USA Today, The Baltimore Sun, Minneapolis Star Tribune, Florida Sun-Sentinel and the New York Post.

8.      In May 2014, Plaintiff was hired by Aquent, a staffing company that provides creative, digital and marketing talent to businesses throughout the world.

9.      Plaintiff was hired by Aquent to join AARP's Audience Engagement team as a web producer for an extended on-site engagement at AARP's headquarters in Washington, D.C. The term of Plaintiff's assignment with AARP was scheduled to extend until March 31, 2020.

10.     In her position with AARP, Plaintiff worked full-time hours, reporting directly to AARP Audience Engagement manager Maura White ("White") and, in subsequent years, to Lawrence Contratti ("Contratti") and Josh Hudson.  Plaintiff's role at AARP initially involved serving as homepage producer of AARP's website, and subsequently as a landing page producer.

11.     Although Plaintiff received her paycheck from Aquent, she had no day-to-day or even weekly or monthly contact with Aquent, with the exception of interactions, largely by email or phone, almost exclusively initiated by Plaintiff.  Plaintiff's schedule was controlled by AARP and her assignments and daily activities were dictated and overseen entirely by her supervisors at AARP with no input whatsoever from Aquent.  In addition, Plaintiff's workstation, computer, email and the software tools used to perform her job were all provided by AARP.

12.     On the first day of her assignment at AARP, Plaintiff was provided with AARP's "Welcome Packet" which contained, among other things, AARP's Code of Conduct, Attendance and Tardiness Guidelines, Dress Code and other requirements to which she was required to adhere.  Further, Plaintiff was required to notify her AARP managers regarding any time out of the office and obtain approval in advance from AARP management before taking any time off for vacation or any other purpose.

13.     From the outset, Plaintiff established herself as one of the more creative, multifaceted and productive members of the Audience Engagement team -- managing the AARP homepage, copywriting and performing various other tasks as assigned by her AARP supervisors, updating and redesigning of AARP's landing pages and later publishing pieces of content.

14.     The quality of Plaintiff's work was outstanding, as recognized in writing by her own manager and other members of management throughout her employment, including in 2017 and during the period leading up to her abrupt termination in March 2018.

15.     For example, in August 2017, White emailed Plaintiff lauding an article by Plaintiff that had just been published on AARP's website and had already been viewed over 15,000 times.  AARP's Chief Digital Officer Sami Hassanyeh and Senior Vice President Nataki Edwards also sent written congratulations to Plaintiff praising her work on this article.

16.     On January 19, 2018, Plaintiff received a handwritten note from White commending her for her team contributions.  White wrote: "Thank you for bringing your journalistic, web and creative gifts to the team and AARP.  No one pushes harder to stretch and grow, and it is evident in the development of your work.  Keep it up!  So happy to have you on the team."

17.     By virtue of Plaintiff's exemplary work performance and professionalism, management sought her feedback on matters integral to AARP's operations.  For example, in December 2017, White and Sandra Moreland, AARP's On-Line Community Manager, separately solicited Plaintiff's input to be used in performance reviews for two full-time AARP employees.   AARP's managers understood Plaintiff's ongoing daily interaction with these employees provided her with unique insight and the ability to provide in-depth evaluations, and she was entrusted to provide information that would be used to assess their job performance.

18.     In October 2017, Plaintiff received confirmation that she was pregnant.  Due to a previous medical procedure, Plaintiff was advised that she must have a mandatory C-section in advance of her July 2018, scheduled due date, or risk serious medical consequences.  To further complicate the situation, Plaintiff suffers from Hashimoto's disease, requiring monthly blood tests to assess her thyroid function, which can endanger fetal development if not treated.

19.     Given her age (nearly 42, at the time) and medical conditions, Plaintiff's pregnancy was deemed "high-risk" by her physicians.

20.     Cognizant of the fact that she would require an increasing number of medical appointments to monitor her high-risk pregnancy, impacting her hours at the office, Plaintiff made the decision in late February 2018 to divulge her pregnancy to her managers as a result of the impending escalation of her medical needs and in accordance with AARP policy regarding advance notice for time off.  At this juncture, Plaintiff was five months pregnant.

21.     Accordingly, on February 26, 2018, Plaintiff contacted her then direct supervisor, Contratti, and divulged her pregnancy.  Plaintiff advised Contratti that her pregnancy was deemed high-risk and that she would in the near future require reasonable time off for mandatory appointments with her medical providers.

22.     Immediately after her discussion with Contratti, Plaintiff contacted Aquent to disclose her pregnancy and corresponding need for occasional time off to accommodate medical appointments.  Neither Contratti nor Aquent voiced objection to Plaintiff's need for future time off to attend medically necessary appointments nor gave any indication that her pregnancy would affect her position with AARP.  In fact, Contratti broached the issue of maternity leave, stating the team would need to arrange backup personnel to cover for Plaintiff's duties during her absence.

23.     On March 1, 2018, at 9:06 a.m., AARP sent a company-wide email formally announcing that nearly all members of the analytics and optimization team (i.e. Audience Engagement) were now moving to the Content team and that all producers, including Plaintiff, would be reporting to Jodi Bettencourt ("Bettencourt"), effective immediately.

24.     Bettencourt and Plaintiff had previously worked together at Travel Channel from March 2011 until March 28, 2014.  During that engagement, Bettencourt, who supervised Plaintiff, engaged in blatant pregnancy discrimination against Plaintiff by engineering the abrupt termination of her long-term contract assignment shortly after Plaintiff disclosed that she had become pregnant.

25.     As at AARP, Plaintiff's performance at Travel Channel was deemed exceptional, yet she was terminated by Bettencourt without justification soon after disclosing her pregnancy.

26.     Given Plaintiff's undisputed outstanding performance throughout her three-year tenure with Travel Channel, the temporal proximity between the disclosure of her pregnancy and her termination and Bettencourt's inability to establish a legitimate and non-discriminatory justification for the decision to effectuate Plaintiff's termination, it was evident that Plaintiff was terminated because of her pregnancy and for no other reason.

27.     Following her termination, Plaintiff accused Bettencourt of pregnancy discrimination.  Plaintiff's pregnancy discrimination claims were later settled under the terms of a confidential settlement agreement.

28.     After her experience at Travel Channel, Plaintiff was understandably distraught about prospect of reporting once again to Bettencourt, this time at AARP.  Accordingly, Plaintiff called Aquent recruiter Tina Tozzi ("Tozzi") at 11:48 a.m. on March 1, 2018 to voice her concerns regarding Bettencourt's potential reaction to her pregnancy.

29.     At 12:30 p.m. that same day, Bettencourt convened a meeting with all "legacy contractors" -- i.e. contract workers from the former Audience Engagement team.  During this meeting, Bettencourt explicitly stated that no immediate team changes would be forthcoming and she emphasized that she valued "solid writing and editing" -- a skill few contract workers being absorbed under the new team possessed, beyond Plaintiff.

30.     By close of business that day, Bettencourt sent an email to all legacy contractors in which she stated "[n]o major changes, business as usual for now," reiterating her earlier promise.  Bettencourt also requested an email from each legacy contractor regarding current responsibilities, project and end dates, and promised to meet individually with each contractor in the coming weeks.

31.     The same day of the new team announcement, at 3:40 p.m., AARP Editor Shelley Emling ("Emling"), who works under Bettencourt, sent out an email to leading AARP editors and writers, praising a recent article written by Plaintiff in "The Girlfriend," a weekly on-line newsletter published by AARP.  In her email, Emling wrote: "Please open your Girlfriend newsletter if you subscribe or go to the girlfriend.com if you don't (I hope you do) … nice piece by our own Lisa Singh in there today.  Thanks much!"

32.     On March 2, 2018, Tozzi called Plaintiff (leading with a statement that Plaintiff was the first person she wanted to call) and assured her that her position was safe.  During this conversation, Tozzi relayed an earlier discussion she had with an AARP editor, Amanda Boltax ("Boltax"), who serves directly beneath Bettencourt.  According to Tozzi, Boltax explicitly stated "[Plaintiff] is not going anywhere -- she has exactly the kind of writing and editing skills we are looking for" (citing Plaintiff's February 28, 2018 article in "The Girlfriend" as evidence of solid writing/editing skills needed for new team).

33.     Tozzi closed the conversation by repeating that Plaintiff was the first person she called to relay the "good news" following the absorption of the Audience Engagement team.

34.     During a subsequent conversation between Plaintiff and Aquent recruiter Chris Woodbridge ("Woodbridge"), Woodbridge also confirmed Plaintiff's job security at AARP, stating: she "was not going anywhere."  Woodbridge further stated in a March 12th email, "We appreciate how your [sic] always a total professional."

35.     On March 5, 2018, Contratti sent an email to all legacy contractors echoing Bettencourt's sentiments expressed at the March 1st meeting.  In his email, Contratti emphasized that "the Content team's mandate is content production" and that there would be "a great emphasis on pitching ideas, writing content, building articles, and updating editorial content" -- skills in which Plaintiff excelled and for which she was regularly praised by AARP management.

36.     On March 6, 2018, at 10:17 a.m., Contratti sent an email to Plaintiff asking if she was "ok with [him] sharing [her] health updates [i.e. pregnancy] with Jodi [Bettencourt] and Amanda."

37.     Later that afternoon, Plaintiff delivered an email to Bettencourt per her earlier instructions, articulating her duties and areas of responsibility.  Tellingly, Bettencourt failed to

respond and, subsequently, did not respond to a follow-up inquiry, which Plaintiff conveyed via email to Contratti (then serving as meeting liaison with Bettencourt), to meet with Plaintiff individually in accordance with Bettencourt's earlier promise to meet with all legacy contractors.

38.    Instead of meeting with Bettencourt, Plaintiff was relegated to conferring with Boltax and Emling by telephone to discuss her role with the new team, after Plaintiff had inquired, yet failed to receive a response, as to whether the meeting should be rescheduled to a time when Bettencourt could participate.

39.    Notably, Emling followed this call with an email on March 15th requesting Plaintiff's assistance with website layout because of her significant "experience with the landing pages."

40.    Putting aside her significant concerns regarding Bettencourt's views of her pregnancy and prior treatment by Bettencourt, Plaintiff focused on her work following the transition and, after the first week, was one of just three legacy contractors to pitch and write an original piece of content.

41.    By the end of March, Plaintiff had out-produced all of the legacy contractors with respect to articles written.  In keeping with the directive for demonstrating "solid writing and editing" -- the skills explicitly valued by Bettencourt -- Plaintiff delivered and published a series of six articles driven by her own ideas under tight deadlines.

42.    In addition, Plaintiff spent the weekend of March 17-18 writing a first-person 1,000-word piece, based on her own original idea, for AARP's The Girlfriend newsletter. Plaintiff rushed to get the piece in after AARP editor Emling inquired on March 13, "… you still able to do your Girlfriend piece?"

43.     On March 14, 2018, Boltax sent a group email to the legacy contractors stating that a select group of five (5) contractors (and one employee) would be trained and receive licenses for TruEdit -- expensive editing software within which their writing was to be inputted. Plaintiff was one of the legacy contractors selected to receive TruEdit training and a license to use the software -- demonstrating that Plaintiff's proven skill set was aligned with the new team's emphasis on writing and editing skills.

44.     Plaintiff's efforts and writing received strong praise from her new editors on Bettencourt's team.  For example, in response to Plaintiff's first piece under new management, Emling stated in a March 8th email: "Good job, Lisa!  That was nice!"  Subsequently, on March 21st, in response to Plaintiff's efforts revising a piece she had written, Emling responded with the following email: "Thanks Lisa!  I thought your piece was great but happy to add in these revisions."

45.     On March 22nd, Plaintiff shared one of her articles with Tozzi at Aquent, who responded: "AWESOME LISA!  Sorry, I haven't gotten back to you yet, still playing catchup from my days out in training but definitely haven't heard anything of concern" -- validating Plaintiff's job performance and obviously seeking to allay Plaintiff's continuing concerns regarding her job security because of her pregnancy.

46.     On March 26th, Boltax responded to one of Plaintiff's articles, noting, "This is really interesting and nice tie-in at the end of the article.  Tomorrow can you pair up with Kim [Hayes], so she can show you how to enter into TruEdit?" -- the latter comment clearly confirming Boltax's understanding that Plaintiff was to be retained and integrated into the new team under Bettencourt.

47.     At 5:16 p.m. on March 30, 2018 Plaintiff received an unexpected telephone call from Tozzi and was notified that her contract assignment at AARP was terminated, effective immediately.  Plaintiff was further advised that her pay would cease immediately, that at best she would be provided with one week's severance pay despite her almost four years of service at AARP and that her health coverage could only potentially extend through the end of April, notwithstanding the fact that she had upcoming medical appointments and a scheduled C-section (now scheduled in mid to late June).

48.     At no point during her tenure with AARP was Plaintiff disciplined for poor performance and, prior to her termination, there was no indication whatsoever that her job was in jeopardy.

49.     The decision to terminate Singh's employment rested with Bettencourt, as Tozzi confirmed in conversation with Plaintiff.  Tozzi also stated she had relayed her confusion to Boltax about Plaintiff's abrupt termination, given Boltax's earlier words of praise about Plaintiff's performance.

50.     Tozzi nonetheless attempted to justify Bettencourt's actions, noting the "at-will" nature of Plaintiff's employment and further, that Plaintiff was one of four individuals terminated.  According to Tozzi, she received an email from Boltax only one hour prior, noting that Plaintiff was terminated because the "[job] either originally hired to do is either done by someone else on our team or is being eliminated."

51.     To the extent any "redundancy" existed, Plaintiff was a proven producer of on-line content and was substantially more qualified than the individuals retained.

52.     Moreover, notwithstanding the alleged "redundancy," Aquent posted a job notice one day prior to Plaintiff's termination seeking to fill several positions at AARP for a Sr. Digital

Producer -- specifically, "an experienced and consumer-facing web journalist to write, edit and produce content for their main website" -- skills Plaintiff indisputably possessed as confirmed, in writing, by both Aquent and AARP management.

53.    On April 2, 2018, Bettencourt sent out a group email announcing the release of Plaintiff and three other legacy contractors, after allegedly "evaluating our needs as a new content (vs. marketing) team before making any organizational decisions."  A total of nine legacy contractors were retained.

54.    Thus, at least according to Bettencourt's alleged selection criteria, the legacy contractors slated for retention and termination were individually assessed with regard to their ability to produce new content and presumably the contractors with the most proficient content skills were retained and those with marketing or other non-content focused experience, were terminated.

55.    With the exception of Plaintiff, the legacy contractors terminated by Ms. Bettencourt indeed lacked the necessary content-focused skills to match the selection criteria identified by Bettencourt and/or were otherwise not suitable for retention for legitimate, non-discriminatory reasons.

56.    While Bettencourt's selection criteria allegedly focused on the needs of her "new content" team, her nine selections consist of a pool of legacy contractors with limited (or no) experience writing content, and marketing or other backgrounds that would not serve to bolster their ability to produce content.

57.    Moreover, most of the legacy contractors that were retained by Bettencourt produced no content whatsoever during the critical March "evaluation" period.

58.     In contrast to the legacy contractors selected by Bettencourt for retention (and those slated for termination), Plaintiff is an accomplished writer/journalist with an established and unassailable track record of producing well-received consumer-facing content for AARP, Travel Channel and a variety of news organizations.   Plaintiff's writing has been widely published in feature articles, essays, news articles and interviews for national and regional publications and media outlets. Plaintiff has also written multimedia content for on-line consumer audiences, across a variety of demographics -- not only at AARP but for leading millennial publication Refinery29, as well as The Washington Post's Brand Studio.

59.     Throughout her tenure with AARP, including during the period leading up to her termination, Plaintiff received accolades from management for her written content.  Notably, just prior to Plaintiff's termination, Boltax -- the individual who later characterized Plaintiff's role as "redundant" -- confirmed to Aquent that "Lisa's not going anywhere -- **she has exactly the kind of writing and editing skills we're looking for**."

60.     Further, during the critical March evaluation period, Plaintiff wrote and published more stories than any other legacy contractor -- a total of six (with one additional story pending publication at the time of her termination) -- more than double the amount written and published by the highest-volume producing contractor selected for retention by Bettencourt.  In addition, during this same time period, Plaintiff pitched more content ideas than any other legacy contractor, four of which were accepted (and assigned to others).

61.     Plaintiff's background and experience as well as her performance and level of production at AARP, both prior to and during the crucial March evaluation period, distinguished her from her fellow legacy contractors with marketing backgrounds or with little or no experience writing consumer-facing content.

62.     During the March evaluation period, Plaintiff significantly out-produced **all** of the legacy contractors with regard to writing pieces of content and pitching ideas.  Indeed, many of the so-called content writers within the pool of legacy contractors under review by Bettencourt did not write a single piece of content or pitch any viable ideas during the month of March.

63.     In Plaintiff's case, Bettencourt inexplicably abandoned her selection criteria and disregarded Plaintiff's acknowledged proficiency as a writer of content and instead retained a number of contractors with markedly inferior qualifications and performance.  Bettencourt's explanation that she terminated Plaintiff because she was "redundant" is a thinly veiled pretext to mask pregnancy discrimination and retaliation.

64.     Defendants' conduct has caused Plaintiff to suffer severe emotional distress, compromising an already high-risk pregnancy, and to incur significant monetary damages due to the loss of her income and benefits.

65.     All conditions precedent to filing suit have been satisfied.

## COUNT I

### Pregnancy Discrimination – Violation of D.C. Human Rights Act

### Both Defendants

66.     Paragraphs 1 through 65 above are hereby adopted and incorporated herein by reference.

67.     The D.C. Human Rights Act, D.C Code Ann. § 2-1401, *et. seq.*, prohibits all forms of employment discrimination for any reason other than that of individual merit, including discrimination by reason of sex.

68.     Under the D.C. Human Rights Act, D.C Code Ann. § 2-1401.05, discrimination on the basis of sex includes discrimination on the basis of pregnancy.

69.     At all relevant times, Plaintiff was an employee as defined by the D.C. Human Rights Act, D.C. Code Ann. § 2-1401.02(9).

70.     Defendant Aquent is an employer as defined by the D.C. Human Rights Act, D.C. Code Ann. § 2-1401.02(10).

71.     At all relevant times, Defendant AARP controlled the means and manner of Plaintiff's performance, including, without limitation, her work assignments and schedule, supervised her work and daily activities, furnished her office and all of the equipment, software and other tools necessary to perform her job and retained the ability to terminate her employment.  As such, AARP is Plaintiff's joint employer with Aquent and is also an employer as defined by the D.C. Human Rights Act, D.C. Code Ann. § 2-1401.02(10).

72.     Defendants' actions as described above, constitute willful, intentional and unlawful employment discrimination against Plaintiff on the basis of her pregnancy in violation of the D.C. Human Rights Law, D.C. Code Ann. § 2-1401.01, *et. seq*.

73.     As a result of Defendants' willful, intentional and unlawful discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

74.     Defendants' actions as described above were undertaken with actual malice.

75.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendants for damages for back pay, loss of benefits and all other pecuniary damages arising out of her termination in the amount of $200,000.00 or such other amount as may be established at trial;

b.      That judgment be entered in favor of Plaintiff and against Defendants for equitable relief in the form of reinstatement or, in the alternative, front pay in the amount of $200,000.00;

c.      That judgment be entered in favor of Plaintiff and against Defendants for compensatory and punitive damages in the amount of $1,000,000.00;

d.      That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

e.      Pre and post judgment interest at the highest rate permitted by law; and

f.      Such other and further relief as the Court deems just and proper.

## COUNT II

### Retaliation – Violation of D.C. Human Rights Act

### Both Defendants

76.     Paragraphs 1 through 75 above are hereby adopted and incorporated herein by reference.

77.     By complaining about being discriminated against by Bettencourt on account of her pregnancy following the termination of her employment with Travel Channel and subsequently by voicing concerns regarding the possibility of pregnancy discrimination at AARP, Plaintiff engaged in statutorily protected activity.

78.     Plaintiff was subjected to adverse employment action in the form of her unlawful termination on March 30, 2018.

79.     A causal connection exists between Plaintiff's protected activity and the adverse action to which she was subjected given, among other things, that Plaintiff was previously

terminated by Bettencourt because of her pregnancy and because she was terminated less than 30 days after Bettencourt became her supervisor at AARP.

80.     Defendants' actions as described above, including, without limitation, terminating Plaintiff's employment, constitute willful, intentional and unlawful retaliation against Plaintiff as a result of statutorily protected activity in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1402.61.

81.     As a result of Defendants' willful, intentional and unlawful conduct, Plaintiff has suffered and will continue to suffer lost wages, severe mental and emotional distress, and other pecuniary and non-pecuniary damages.

82.     Defendants' actions as described above were undertaken with actual malice.

83.     All conditions precedent to Plaintiff's right of recovery have been fully satisfied.

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

a.     That judgment be entered in favor of Plaintiff and against Defendants for damages for back pay, loss of benefits and all other pecuniary damages arising out of her termination in the amount of $200,000.00 or such other amount as may be established at trial;

a.     That judgment be entered in favor of Plaintiff and against Defendants for equitable relief in the form of reinstatement or, in the alternative, front pay in the amount of $200,000.00;

b.     That judgment be entered in favor of Plaintiff and against Defendant for compensatory and punitive damages in the amount of $1,000,000.00.

c.     That Plaintiff be awarded reasonable attorney's fees and all costs and expenses incurred by Plaintiff in bringing this action;

d.     Pre and post judgment interest at the highest rate permitted by law; and

e.        Such other and further relief as the Court deems just and proper.

                          Respectfully submitted,

                          SMITH, LEASE & GOLDSTEIN, LLC


                  By:        Marc J. Smith_____
                          Marc J. Smith
                          Bar No. 14355
                          11 North Washington Street
                          Suite 520
                          Rockville, Maryland 20850
                          Phone: (301) 838-8950

                          Counsel for Plaintiff

                    **<u>TRIAL BY JURY DEMANDED</u>**

Plaintiff hereby requests trial by jury.


                  By:   __Marc J. Smith_____
                          Marc J. Smith