**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LISA SINGH,                      )
                                  )
        *Plaintiff,*       )
                                  )
v.                         )     Case No. 1:18-cv-1247-RCL
                                  )
AMERICAN ASSOCIATION OF   )
RETIRED PERSONS, INC., *et al.*,  )
                                  )
        *Defendants.*     )
_____)

**MEMORANDUM OPINION**

Plaintiff Lisa Singh filed this lawsuit against American Association of Retired Persons, Inc. ("AARP") and Aquent, LLC ("Aquent") in May of 2018. Ms. Singh was an Aquent employee assigned to work as a contractor at AARP. In March of 2018, when Ms. Singh was approximately six months pregnant, AARP terminated her assignment. She accuses AARP of discrimination and retaliation in violation of the District of Columbia Human Rights Act ("DCHRA") and accuses Aquent of the same under a joint employer theory of liability. Both defendants have filed for summary judgment (ECF Nos. 27 & 28). Upon consideration of the motions, opposition (ECF No. 36), and replies (ECF Nos. 39 & 40), the Court has determined that (when viewing the evidence in the light most favorable to the plaintiff) a reasonable juror could find either defendant liable for discrimination. Although no reasonable juror could find Aquent liable for retaliation, the Court has determined that (when viewing the evidence in the light most favorable to the plaintiff) a reasonable juror could find AARP liable for retaliation. The Court will therefore **DENY** AARP's Motion for Summary Judgment (ECF No. 28) and **GRANT IN PART AND DENY IN PART** Aquent's Motion for Summary Judgment (ECF No.

1

27). The Court will **ORDER** that Count II against Aquent is **DISMISSED WITH PREJUDICE**
and enter **JUDGMENT** for Aquent on Count II.


## BACKGROUND

Aquent is a temporary staffing agency that employed Ms. Singh and assigned her to work
as a contractor at AARP in May of 2014. Tozzi Dep. at 12; Singh Dep. at 51-52. Although Ms.
Singh was an Aquent W-2 employee, AARP controlled her daily work activities, schedule, etc.
Tozzi Dep. at 15-20. AARP had the authority to terminate her assignment at any time. *Id.* In
October of 2017, Ms. Singh learned that she was pregnant. Singh Dec. ¶ 21. She shared this
information with her managers in February of 2018, including the fact that her pregnancy was
high-risk. *Id.* at ¶ 22.

On March 1, 2018, AARP made a company-wide announcement of certain impending
organizational changes, including its decision to transfer many producers from the Audience
Engagement team to the Content team supervised by Jodi Bettencourt. Ms. Singh had previously
worked under Ms. Bettencourt while employed at Travel Channel a few years earlier. Singh Dep.
at 77-78. In January of 2014, Ms. Singh had disclosed to Ms. Bettencourt that she was pregnant,
and the following day, Ms. Bettencourt allegedly told Ms. Singh that her employment with
Travel Channel would soon be terminated. Singh Dep. at 60. After her actual termination from
Travel Channel a few months later, Ms. Singh accused Ms. Bettencourt of pregnancy
discrimination, and Ms. Singh and Travel Channel reached a confidential settlement agreement.
Singh Dep. at 57; Singh Dec. ¶ 12. Upon learning that she would once again be working under
Ms. Bettencourt pursuant to AARP's reorganization plans, plaintiff contacted Tina Tozzi
(Aquent's Director of Strategic Accounts and Ms. Singh's primary point of contact at Aquent);

according to Ms. Singh, she informed Ms. Tozzi of the following points: (1) Ms. Bettencourt had previously been her manager at Travel Channel; (2) pregnancy should not be viewed as a liability; (3) Ms. Bettencourt needs to know that contractors have rights just like regular employees; and (4) if you have medically necessary appointments, you can still do your job. Singh Dep. at 152-53. Ms. Tozzi remembers this phone call but does not remember Ms. Singh's concerns about the reorganization being related to her pregnancy. Tozzi Dep. at 106-108.

Over the next few weeks, AARP worked to figure out how its reorganization plans would impact contractors and employees. On March 8, 2018, Larry Contratti (Ms. Singh's second-level supervisor at AARP) emailed Ms. Bettencourt and Amanda Boltax to inform them of Ms. Singh's pregnancy. Both women have admitted to discussing Ms. Singh's pregnancy and characterizing it as "convenient." Bettencourt Dep. at 102; Boltax Dep. at 122-23. On March 29, 2018, Ms. Boltax emailed Ms. Tozzi to notify her that AARP was ending its relationship with Ms. Singh. Boltax Dep., Exh. 12. Ms. Tozzi responded that she was surprised by the decision and asked for feedback. *Id.* Ms. Boltax replied that Ms. Singh's original responsibilities had been transferred to another employee, and AARP did not want to retain her because her teammates said she was difficult to work with and her supervisors frequently found errors in her work. Tozzi Dep., Exh. 11. Ms. Tozzi called plaintiff on March 30, 2018 to inform her of AARP's decision. Singh Dec. ¶ 28. Although Ms. Bettencourt outranked Ms. Boltax at AARP, they have both claimed that Ms. Boltax was responsible for the ultimate decision to terminate Ms. Singh. Boltax Dep. at 35; Bettencourt Dep. at 127. In May of 2018, Ms. Singh filed this lawsuit against both AARP and Aquent for discrimination and retaliation in violation of the DCHRA. Both defendants deny that Ms. Singh's termination was based on discrimination or retaliation.

**LEGAL STANDARDS**

## I. SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010). To show that a dispute is "genuine" and defeat a summary judgment motion, the nonmoving party must present evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If, however, "there are genuine issues that properly can be resolved only by a finder of fact," summary judgment is not appropriate. *Id.* at 250. When deciding a summary judgment motion, the Court is not supposed to weigh the evidence—rather, the Court must determine whether there is contradictory evidence to be weighed at trial. *See Abraham v. Graphic Arts Int'l Union*, 660 F.2d 811, 814 (D.C. Cir. 1981).

## II. DISCRIMINATION & RETALIATION CLAIMS

The DCHRA prohibits all forms of employment discrimination, including sex discrimination, which encompasses pregnancy discrimination.[1] D.C. Code Ann. § 2-1401.05(a). The DCHRA also prohibits retaliation against employees for engaging in statutorily protected activity, considering it to be another form of discrimination. D.C. Code Ann. § 2-1402.61.

---

[1] DCHRA claims are generally evaluated under the same legal framework as Title VII claims. *See Sparrow v. United Air Lines*, 216 F.3d 1111, 1114 n.3 (D.C. Cir. 2000). The Court can properly adjudicate plaintiff's DCHRA claims based on diversity jurisdiction. 28 U.S.C. § 1332.

Employment discrimination and retaliation claims that rely on circumstantial evidence—as opposed to direct evidence of discrimination—are analyzed under the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the employee "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." *Id.* at 802. In cases concerning sex discrimination, a *prima facie* case requires a showing that "(1) [the plaintiff] is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (citing *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

If the employee establishes a *prima facie* case of discrimination, the burden "must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [action]" so as to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). The employer, however, "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

If the employer succeeds in offering legitimate, nondiscriminatory reasons for the action, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253. The plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. Either way, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Evidence of pretext may

include "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff" as well as any "other relevant evidence that a jury could *reasonably* conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (emphasis added).

Retaliation claims are subject to the same *McDonnell Douglas* burden shifting standard as discrimination claims. *Walker*, 798 F.3d at 1091. To establish a *prima facie* case of retaliation, "the plaintiff must allege that she engaged in activity protected by [the statute], the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Id.* at 1091-92. The plaintiff must also establish that retaliation was a rationale for the adverse action in order to prove causation. Once the plaintiff establishes these three elements of a *prima facie* case, "the burden shifts to the employer to identify the legitimate, . . . non-retaliatory reason on which it relied in taking the complained-of action." *Walker*, 798 F.3d at 1092. Then, the plaintiff must show "that the employer's stated reasons were pretextual, and the real reason[] [was] prohibited . . . retaliation." *Id.* The aforementioned categories of evidence demonstrating pretext in discrimination claims also apply to retaliation claims.

In practicality, the issue of whether the plaintiff has established a *prima facie* case of discrimination or retaliation under *McDonnell Douglas* "is almost always irrelevant." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "[B]y the time the district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory [and non-retaliatory] reason for the challenged decision," which is "important because once the employer asserts a legitimate, non-

discriminatory [and non-retaliatory] reason, the question [of] whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id.* (quoting *Hicks*, 509 U.S. at 510-11). Therefore, the D.C. Circuit has stated:

> [W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory [and non-retaliatory] reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory [and non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated against or] discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* at 494; *see Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (explaining that the simplified *McDonnell Douglas* standard applies to retaliation claims as well). It is also important to note that when a plaintiff shows pretext, she is not required to prove that discrimination or retaliation was the but-for cause of the adverse action. Although all parties in this case have referenced the but-for standard, the DCHRA sets a lower bar for causation, requiring only that discrimination or retaliation be part of the reason for the adverse action. D.C. Code Ann. § 2-1402.11(a) (explaining that an adverse action is unlawful if taken "wholly *or partially* for a discriminatory reason") (emphasis added).[2]

---

[2] Although the DCHRA does not require but-for causation in order to prove a discrimination claim, Ms. Singh has brought forth evidence sufficient for a reasonable juror to conclude that discrimination was the but-for cause of her termination from AARP. The Court's decision regarding discrimination would thus be the same under either standard. As for retaliation, the DCHRA does not specify whether this lower standard also applies to retaliation claims, but because the DCHRA considers retaliation to be a form of discrimination, the Court believes that the standard is the same for both types of claims. *See* D.C. Code Ann. § 2-1402.61 ("It shall be an unlawful *discriminatory* practice to . . . retaliate against" a person for engaging in statutorily protected activity) (emphasis added). Like with Ms. Singh's discrimination claims, however, the Court's decision regarding retaliation would be the same under either standard, as she has brought forth sufficient evidence such that a reasonable juror could find retaliation to be the but-for cause of her termination.

## ANALYSIS

## I. CLAIMS AGAINST AARP

Ms. Singh has brought one discrimination claim and one retaliation claim against AARP. For the reasons explained below, Ms. Singh's discrimination and retaliation claims both raise genuine issues of material fact that need to be resolved by a factfinder.

### A. Ms. Singh's Discrimination Claim Raises Genuine Issues of Material Fact.

Ms. Singh's contractor status with AARP was terminated in March of 2018 when she was approximately six months pregnant. Under the simplified *McDonnell Douglas* framework, there is no need to assess whether she has established a *prima facie* case of discrimination because AARP has already proffered a legitimate, non-discriminatory reason for terminating her. AARP claims that because of internal reorganization, there was no longer a position for her at the company. It also claims that her co-workers found her difficult to work with and that her work frequently contained errors. Ms. Singh, however, has brought forth sufficient evidence such that a reasonable juror could find pretext for unlawful discrimination. Although no single independent piece of evidence that she points to is sufficient to lead a jury to find AARP liable, the evidence in totality raises a genuine dispute of material fact, making summary judgment improper. This is common in employment discrimination cases, as there is rarely direct evidence of discrimination—rather, a plaintiff must rely on multiple pieces of circumstantial evidence to prove discriminatory animus by a preponderance of the evidence.

AARP's main argument is that after the reorganization, Ms. Singh did not meet any of the remaining job descriptions and thus there was simply no place for her. One piece of evidence that Ms. Singh points to in her effort to rebut this assertion is that she has strong writing skills. AARP argues that writing (Ms. Singh's recognized strength) was not going to be part of the

production job that would remain after the reorganization, and AARP was instead looking for "well-rounded producers who had broadcast experience, graphic design experience, and demonstrated that they had worked with video and podcasts as well as traditional media." ECF No. 28-2 at 6. Ms. Singh, however, points to the deposition of Mr. Contratti, who stated that written content was a priority for the new team after the reorganization. Contratti Dep. at 26-27. Likewise, Ms. Bettencourt admitted during her deposition that she told the Audience Engagement team during a meeting on March 1, 2018 that she wanted "people who knew what good writing was" and considered writing skills to be a priority for the reorganized team. Bettencourt Dep. at 52-55. Plaintiff also points to numerous other pieces of evidence suggesting that writing skills were important to the reorganized team, yet AARP argues that plaintiff's writing skills are irrelevant because the Court's role is not to question the wisdom of AARP's personnel choices, but rather to determine whether those personnel choices were discriminatory. Because, however, AARP has cited no longer needing Ms. Singh's skills after the reorganization as its reason for terminating her, plaintiff's writing skills *are* relevant, as they directly rebut the validity of AARP's stated rationale. Ms. Singh has shown ample evidence that AARP valued her writing skills before announcing the reorganization, and she has also shown that she frequently outproduced her teammates. She has also pointed to evidence suggesting that (contrary to AARP's assertions), writing skills were still necessary after the reorganization. Additionally, Ms. Singh highlights the job posting that AARP put out after the reorganization, which was supposedly very similar to the job posting for the position from which she was terminated. Boltax Dep., Exh. 14. Although AARP disputes Ms. Singh's characterization of the post-reorganization job notice, that is a factual dispute for a jury to resolve.

A reasonable juror could also be troubled by the fact that Ms. Bettencourt interviewed every single member of the Audience Engagement team except for Ms. Singh prior to making termination decisions. Ms. Bettencourt claimed at her deposition that she could not meet with Ms. Singh due to a "scheduling conflict," Bettencourt Dep. at 85-86, but Ms. Boltax's deposition suggests that Ms. Bettencourt did not want to participate in Ms. Singh's interview because of what happened at Travel Channel, Boltax Dep. at 49-50. Although this evidence is more probative of Ms. Singh's retaliation claim, it nonetheless calls into question the truthfulness of Ms. Bettencourt's testimony, including her statements about why Ms. Singh was terminated.

Oftentimes, plaintiffs in employment discrimination cases use comparator evidence, which involves looking at others who were similarly situated and how the employer treated them. Here, AARP suggests that because Christine Carson—another team member who was on maternity leave in March of 2018—was not terminated, AARP must not have discriminated against Ms. Singh based on pregnancy. Although AARP can argue this at trial, it does not definitively prove that Ms. Singh's claim will fail. The jury must weigh this evidence, especially because Ms. Singh has alleged that AARP only retained Ms. Carson because she resumed her work in March of 2018, shortly after AARP announced its impending reorganization. Singh Dec. ¶ 25. Although Ms. Boltax testified at her deposition that Ms. Carson did not return until April of 2018, Boltax Dep. at 45-46, that is a factual dispute for the jury to resolve. Additionally, it is possible that AARP recognized that it would find itself in serious legal trouble if it simultaneously terminated an employee on maternity leave and an employee who was about to take maternity leave. Essentially, although AARP's decision not to terminate Ms. Carson could end up being very compelling at trial, it is not dispositive, and it does not entitle AARP to summary judgment. Furthermore, AARP suggests that because it terminated multiple other non-

pregnant contractors at the same time, Ms. Singh could not have been fired due to pregnancy discrimination. This logic is flawed. Ms. Singh does not dispute that AARP was reorganizing, nor does she dispute that some terminations were necessary to effectuate that reorganization. The issue is whether Ms. Singh was selected as one of the contractors to be terminated because of her pregnancy. AARP is welcome to present evidence at trial that non-pregnant contractors were terminated at the same time as Ms. Singh, but that evidence does not entitle it to summary judgment.

Another rationale that AARP uses to justify Ms. Singh's termination is the allegedly poor reviews she received from her co-workers. During her deposition, however, Ms. Boltax was unable to recall which member or members of the former Audience Engagement team said that Ms. Singh was difficult to work with. Boltax Dep. at 90-91. There is also no evidence to suggest that Ms. Singh ever received poor feedback prior to March of 2018, as both Maura White and Mr. Contratti had given her positive reviews before then. White Dep. at 35-36; Contratti Dep. at 16, Exh. 1. AARP has also stated that Alyson Casey, the Quality Assurance contractor, made negative comments about constantly having to correct errors in Ms. Singh's work. Tozzi Dep., Exh. 11. Again, much of the evidence directly contradicts this feedback. Of course, the Court's job is not to determine whether AARP made a wise decision in terminating Ms. Singh, but the Court also cannot blindly accept AARP's stated rationale—if AARP genuinely believed that Ms. Singh produced poor work, then it had every right to fire her. If, however, that belief was not genuine, AARP cannot be permitted to use it as an excuse for terminating Ms. Singh if its real reason was her pregnancy. Based on the evidence that Ms. Singh has brought forth, a reasonable juror could find the allegedly poor feedback from co-workers and supervisors to be a cover for discrimination. To be clear, the Court is not accusing AARP of lying about any of this

information, but the timing of the negative feedback could be viewed with suspicion, meaning that a factfinder will need to assess this evidence carefully at trial.

Furthermore, Ms. Singh has brought forth evidence that the timing of her termination was highly suspicious. Although Ms. Boltax admits that she considered Ms. Singh to be the strongest candidate for the reorganized Quality Assurance position on March 2, 2018 (before Ms. Boltax learned of Ms. Singh's pregnancy), Ms. Singh was terminated later that month—but Ms. Boltax did not eliminate the Quality Assurance position until *after* terminating Ms. Singh. Boltax Dep. at 46-47, 70, 73. Additionally, the reactions of Ms. Boltax and Ms. Bettencourt upon learning about Ms. Singh's pregnancy could suggest that Ms. Singh's termination was the result of discrimination. Ms. Bettencourt admitted during her deposition that she discussed with Ms. Boltax how the email informing them of Ms. Singh's high-risk pregnancy "came out of the blue" and was "totally out of context and deliberate." Bettencourt Dep. at 104. Ms. Boltax admitted to feeling that the email was meant to "influence" her decision. Boltax Dep. at 122-23. These negative reactions coupled with the suspicious timing of Ms. Singh's termination could be influential in leading a reasonable juror to find discrimination based on pregnancy.

It is important to recognize that AARP and Aquent both accuse Ms. Singh of "cherry-pick[ing]" quotes from depositions, using misleading portions of exhibits, telling "half-truths," etc. ECF No. 39 at 19; ECF No. 40 at 1. The fact remains, however, that these quotes and pieces of evidence exist. If AARP believes that the evidence Ms. Singh cites is misleading or being taken out of context, it may argue that at trial. The jury may very well agree with AARP's characterization of what occurred in March of 2018; however, as long as evidence exists that would permit a reasonable juror to find in Ms. Singh's favor, it is not the Court's place to weigh that evidence. If there is evidence to be weighed, the factfinder must do so at trial. Again, it is

important to remember that in cases relying upon circumstantial evidence, there is rarely a "smoking gun;" rather, the factfinder must assess the evidence as a whole and determine whether it is more likely than not that AARP terminated Ms. Singh based on impermissible pregnancy discrimination. When viewing the evidence in the light most favorable to Ms. Singh, it is clear that a reasonable juror could find that AARP's stated rationales for terminating Ms. Singh are mere pretext for pregnancy discrimination, thus making summary judgment inappropriate.

### B. Ms. Singh's Retaliation Claim Raises Genuine Issues of Material Fact.

Ms. Singh's retaliation claim against AARP is based on her belief that Ms. Bettencourt retaliated against her for accusing her of pregnancy discrimination at Travel Channel. Although Ms. Singh's conversation with Ms. Tozzi on March 1, 2018 is not protected behavior, Ms. Singh clearly engaged in protected behavior when she accused Ms. Bettencourt of pregnancy discrimination in 2014, which ultimately resulted in a confidential settlement agreement with Travel Channel. AARP, however, denies that Ms. Singh's termination in March of 2018 was retaliatory. AARP first attempts to refute the retaliation claim by arguing that it was Ms. Boltax and not Ms. Bettencourt who made the decision to terminate Ms. Singh. According to AARP, because there is no evidence that Ms. Bettencourt told Ms. Boltax about Ms. Singh's accusations at Travel Channel, Ms. Boltax's decision to terminate her could not have been retaliatory. The Court, however, finds that Ms. Singh has raised a genuine question of material fact as to Ms. Bettencourt's role in her termination. Although AARP points out that Ms. Boltax and Ms. Bettencourt "testified under oath . . . on at least *six separate instances* . . . that Ms. Boltax had 100% authority to make the personnel decisions as to who would be retained as part of the new digital producer team," ECF No. 40 at 9, there is conflicting evidence on this point. AARP acknowledges that Ms. Bettencourt was Ms. Boltax's supervisor, *id.*, which could raise questions

about whether Ms. Boltax really made the decision independently. Ms. Bettencourt was also heavily involved in the interview process, and Ms. Bettencourt and Ms. Boltax admit that they discussed the termination decisions at length. Additionally, Ms. Boltax's and Ms. Bettencourt's own depositions could be read as suggesting that Ms. Bettencourt was more involved than AARP wants the Court to believe. For example, it is undisputed that Ms. Boltax needed Ms. Bettencourt's "approval," and Ms. Bettencourt had to "sign off" on Ms. Boltax's decisions. Boltax Dep. at 80-81. It is thus for a factfinder to determine whether the decision really was "100%" Ms. Boltax's as AARP claims. *Id.* Regardless of how many times Ms. Boltax and Ms. Bettencourt testified under oath that Ms. Singh's termination was Ms. Boltax's decision, a reasonable juror could conclude otherwise. The question of Ms. Bettencourt's involvement in the decision is crucial, as she admits that she harbored "hurt" over Ms. Singh's accusations against her at Travel Channel. Bettencourt Dep. at 32-33. Therefore, a jury must decide whether to believe AARP's assertion that Ms. Boltax made the decision to terminate Ms. Singh by herself, as resolution of this issue involves determinations about witness credibility.

The defense has also argued that the events at Travel Channel were too far removed from Ms. Singh's termination in March of 2018 to constitute retaliation. Approximately four years passed between Ms. Singh's termination from Travel Channel and her termination from AARP. Ordinarily, this would undermine a plaintiff's attempts to show causation. *See, e.g.*, *Payne v. District of Columbia Government*, 722 F.3d 345, 354 (D.C. Cir. 2013) (noting that "[o]nce the time between a protected disclosure and a negative employment action has stretched to two thirds of a year," there is no longer "temporal proximity" supporting a causal connection between the two events). In *Payne*, however, the D.C. Circuit noted that the lack of temporal proximity would not have been fatal to the plaintiff's claim if he provided other convincing

evidence of causation, which he failed to do. *Id.* In contrast, Ms. Singh is not basing her claim on temporal proximity, so a lack of temporal proximity is not fatal.[3] Another important distinction is that *Payne* dealt with the District of Columbia Whistleblower Protection Act rather than the DCHRA; however, even if *Payne* did involve the DCHRA, this situation would still be unique. Unlike in *Payne* where the plaintiff remained employed by the same entity (the D.C. government), the facts underlying Ms. Bettencourt's alleged retaliation involve two separate employers—after Ms. Singh accused Ms. Bettencourt of pregnancy discrimination at Travel Channel, Ms. Singh went to work at AARP and did not report directly to Ms. Bettencourt again until March of 2018. Therefore, Ms. Bettencourt would not have had an opportunity to retaliate against her during those four intervening years. If Ms. Bettencourt had remained Ms. Singh's supervisor throughout that time, the Court would find the lack of temporal proximity to be more concerning; however, March of 2018 was the first opportunity Ms. Bettencourt would have had in four years to retaliate against Ms. Singh, so those four years do not undermine Ms. Singh's retaliation claim. Although AARP is welcome to highlight the intervening years for a jury, a reasonable juror could still find by a preponderance of the evidence that AARP's stated rationales for terminating Ms. Singh were mere pretext for retaliation. When viewing the evidence in the light most favorable to Ms. Singh, summary judgment for AARP is inappropriate.

---

[3] The D.C. Circuit has recognized that there are certain cases in which temporal proximity alone is sufficient to establish a *prima facie* case of retaliation. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). In this case, however, Ms. Singh is not basing her retaliation claim against AARP on temporal proximity. Therefore, the lack of temporal proximity is not fatal to her retaliation claim, and the line of cases that the defense cites are inapplicable.

## II. CLAIMS AGAINST AQUENT

Ms. Singh has brought one discrimination claim and one retaliation claim against Aquent.[4] For the reasons explained below, Ms. Singh's discrimination claim raises genuine issues of material fact that need to be resolved by a factfinder, but her retaliation claim does not. Summary judgment in Aquent's favor is therefore appropriate only on the retaliation claim, which fails as a matter of law.

### A. Ms. Singh's Discrimination Claim Raises Genuine Issues of Material Fact.

Aquent argues that because Ms. Singh's discrimination claim against AARP cannot survive and her discrimination claim against Aquent is based on joint employer liability, it follows that her discrimination claim against Aquent cannot survive. As explained above, however, AARP is not entitled to summary judgment on the discrimination claim. Therefore, this preliminary argument is invalid.

Aquent also argues that even if Ms. Singh's discrimination claim against AARP can survive, Aquent cannot be held liable for AARP's actions. The D.C. Circuit does not appear to have directly addressed joint employment liability in this context, but case law from other Circuit Courts of Appeals suggests that a staffing agency is only liable for the discriminatory conduct of its joint-employer client if it (1) participated in the discrimination; or (2) knows or should have known of the client's discrimination but fails to take corrective measures within its control. *See, e.g.*, *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 189-90 (5th Cir. 2016);

---

[4] Aquent argues that Ms. Singh did not comply with Local Rule 7(h) when completing her statement of material facts, and therefore Aquent's statement of material facts should be deemed admitted. Although the Court would have preferred Ms. Singh to address each of the defendants' statements of material facts paragraph by paragraph, Local Rule 7(h) is not as strict as Aquent believes it to be. Although the format Ms. Singh chose did make it more difficult to establish which facts were contested and which were not, deeming defendants' statements of material facts to have been admitted would be extreme and unjustified. Aquent would like the Court to believe that this is a commonplace remedy, but AARP's choice not to mention this issue in its motion or reply is further confirmation that Aquent's request is unreasonable.

*Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33, 46 (D.D.C. 1997). There is no evidence that Aquent actually participated in any discriminatory conduct, so in order to prevail, Ms. Singh must rely on the second prong of the test. Aquent does not dispute that it has joint employer status with AARP, but it does dispute any liability for AARP's conduct.

After viewing the available evidence in the light most favorable to Ms. Singh, the Court finds that a reasonable juror could conclude that Aquent knew or should have known of AARP's discrimination[5] and failed to take corrective measures within its control. Looking first at the March 1, 2018 telephone conversation that Ms. Singh had with Ms. Tozzi, Ms. Singh and Ms. Tozzi gave different accounts of this conversation during their depositions; however, for summary judgment purposes, the Court must examine this evidence in the light most favorable to Ms. Singh. Assuming that a jury believes Ms. Singh's account of the conversation, that conversation should have raised concerns about whether Ms. Bettencourt would respect Ms. Singh's rights as a pregnant contractor. As explained later in this Memorandum Opinion, this conversation was insufficient to put Aquent on notice of any alleged retaliation, but Ms. Singh's repeated pleas to have Ms. Tozzi convey to Ms. Bettencourt that pregnant contractors have legal rights is critical. At the very least, it shows that Ms. Singh was extremely concerned about how Ms. Bettencourt would react to her pregnancy. In response to Ms. Singh's concerns, Ms. Tozzi reached out to Ms. Boltax (rather than Ms. Bettencourt as Ms. Singh allegedly requested) on March 2, 2018. According to Ms. Singh, Ms. Boltax told Ms. Tozzi that Ms. Singh was "not going anywhere" because she had "exactly the kind of writing and editing skills we're looking

---

[5] Of course, if a jury finds that AARP is not liable for discrimination, Aquent will not be liable for discrimination either; however, the Court has to assume for the purposes of analyzing the discrimination claim against Aquent that AARP is liable for discrimination. This section of the Memorandum Opinion is therefore written as if AARP has already been found liable for discrimination, but this should not be taken as any indication of what the Court believes a jury will actually find at trial.

for."[6] Singh Dep. at 156-57. Ms. Tozzi supposedly relayed this information to Ms. Singh, but Ms. Tozzi never contacted Ms. Bettencourt as Ms. Singh requested. When Ms. Tozzi learned of Ms. Singh's termination via email on March 29, 2018, she expressed her surprise to Ms. Boltax, and Ms. Tozzi called Ms. Singh the next day to inform her of AARP's decision. Tozzi Dep. at 126-27. When Ms. Singh spoke with Ms. Tozzi after learning that she had been fired, Ms. Singh allegedly said, "You don't fire a woman who is six months pregnant, and you don't tell me over the past few weeks, 'Lisa's not going anywhere.'" Singh Dep. at 156-57. Ms. Singh allegedly went on to ask if her abrupt job termination represented a value that Aquent was comfortable with, and Ms. Tozzi supposedly replied, "Sadly, we see this more often than we like to, and most clients come back and say it's an 'at-will state.' Companies change and needs change, that's just how it goes. Unfortunately, that is likely what the response is going to be from [AARP]." Singh Dec. ¶ 28. Ms. Tozzi has a different account of the conversation, claiming instead that Ms. Singh "just started screaming" at her, but Ms. Tozzi's deposition does not reveal many details about her recollection of this conversation. Tozzi Dep. at 127. Of course, for the purposes of summary judgment, the Court must assume that a jury will believe Ms. Singh's account of the conversation.

A reasonable juror could conclude that Ms. Singh's concerns about Ms. Bettencourt's reaction to her pregnancy on the March 1, 2018 phone call,[7] Ms. Boltax's alleged assurances that Ms. Singh's job was safe before she learned of her pregnancy, and the surprising decision to terminate Ms. Singh after learning of her pregnancy put Aquent on notice that AARP acted discriminatorily. A reasonable juror could also potentially find that Ms. Tozzi's response to Ms.

---

[6] There appears to be some dispute about what exactly was said during that phone call, thus creating another factual question for the jury to resolve.
[7] Again, the Court must assume that Ms. Singh's account of that conversation with Ms. Tozzi is the one that the jury will believe.

Singh's statement upon learning that she had been terminated indicated that Ms. Tozzi believed AARP acted discriminatorily. Ms. Tozzi claims that she did not believe that the termination of Ms. Singh's assignment was related to her pregnancy, Tozzi Dep. at 134-135, but this is a matter of witness credibility. Of course, a jury may examine this evidence and determine that Aquent was not on notice of any discriminatory conduct by AARP; however, because a jury *could* find that these conversations prove Aquent knew or should have known about AARP's discrimination, the Court must move to determining whether a reasonable jury could find that Aquent failed to take corrective measures within its control.

The Court finds that a reasonable juror could conclude that Aquent failed to take corrective measures within its control. For example, a jury may find that Ms. Tozzi should have contacted Ms. Bettencourt (rather than just Ms. Boltax) like Ms. Singh requested on the March 1, 2018 phone call. Perhaps a jury will find that Ms. Tozzi's request for feedback upon learning of Ms. Singh's termination was insufficient, and Aquent should have investigated the matter further. Aquent claims that it was under no obligation to investigate because Ms. Singh never formally requested an investigation, ECF No. 39 at 11-12, but a jury may disagree. Again, this is not to say that a jury *will* find that Aquent failed to take corrective measures; however, the possibility that a reasonable jury will reach that conclusion makes summary judgment for Aquent inappropriate.

### B. Aquent is Entitled to Summary Judgment on Ms. Singh's Retaliation Claim.

Aquent argues that because Ms. Singh's retaliation claim against AARP cannot survive and her retaliation claim against Aquent is based on joint employer liability, it follows that her retaliation claim against Aquent cannot survive. As explained above, however, AARP is not

entitled to summary judgment on the retaliation claim. Therefore, this preliminary argument is invalid.

Aquent also argues that even if Ms. Singh's retaliation claim against AARP can survive, Aquent cannot be held liable for AARP's actions. The same two-pronged test that applies to joint employer discrimination claims also applies to joint employer retaliation claims. Like with the joint employer discrimination claim, there is no evidence that Aquent participated in any retaliatory activity or had any independent retaliatory motive, so Ms. Singh must rely on the second prong of the test.

After examining the available evidence, the Court finds that no reasonable juror could conclude that Aquent knew or should have known of AARP's retaliation, nor could a reasonable juror find that Aquent failed to take corrective measures within its control. Ms. Singh points to the conversation that she had with Ms. Tozzi on March 1, 2018, claiming that this conversation sufficiently informed Aquent of the pregnancy discrimination allegations she made against Ms. Bettencourt four years earlier. Even assuming that a jury believes Ms. Singh's account of this conversation over Ms. Tozzi's account of this conversation, it is still insufficient. When asked during her deposition if she disclosed the pregnancy discrimination allegations that she made against Ms. Bettencourt at Travel Channel, Ms. Singh answered:

> I didn't phrase it that way.
>
> I said to Tina [Tozzi], in that early March conversation, that I have a history with Jodi [Bettencourt]. I don't think she understands that someone who is a contractor, even a contractor has certain rights if they are pregnant. Can you please let her know that there are certain fundamental rights that are in place.
>
> What I expressed and verbalized to her is, I've just gotten an email, like everyone else. And it says Jodi Bettencourt is going to be our new manager. We're meeting with her in less than one hour. I need her to know that I have – she needs to know that even as a contractor, I have certain rights during this pregnancy. She may not

know that based on what I experienced with her at Travel Channel . . . Can you
please convey that to Ms. Bettencourt.

Singh Dep. at 153.

Although this conversation (as Ms. Singh relays it) suggests a negative history with Ms.
Bettencourt and implies that Ms. Singh did not believe Ms. Bettencourt would respect her rights
as a pregnant contractor, it does not suggest that Ms. Singh made any kind of formal complaint
against Ms. Bettencourt, nor does it mention the settlement agreement with Travel Channel. No
reasonable juror could expect Aquent to infer from this conversation that Ms. Singh had engaged
in statutorily protected activity with respect to Ms. Bettencourt. Ms. Singh can point to no other
conversation or piece of evidence that should have put Aquent on notice of the fact that she
engaged in statutorily protected activity in the past. Because Aquent did not know about what
happened at Travel Channel (nor should it be expected to have known), it could not have taken
any corrective measures with respect to AARP's alleged retaliation. In making this finding, the
Court is not merely weighing the evidence—rather, it is making a determination that there is no
evidence sufficient to support Ms. Singh's allegations of retaliation against Aquent. Even when
viewing the available evidence in the light most favorable to Ms. Singh, her retaliation claim
against Aquent still fails as a matter of law. Therefore, judgment for Aquent on Count II is
appropriate.

## CONCLUSION

Based on the foregoing, the Court will **DENY** American Association of Retired Persons,
Inc.'s Motion for Summary Judgment (ECF No. 28) on both Count I (Discrimination) and Count
II (Retaliation).

The Court will **GRANT IN PART AND DENY IN PART** Aquent, LLC's Motion for Summary Judgment (ECF No. 27). Aquent, LLC's Motion for Summary Judgment on Count I (Discrimination) will be **DENIED**. Aquent, LLC's Motion for Summary Judgment on Count II (Retaliation) will be **GRANTED**.

It will be **ORDERED** that Count II (Retaliation) against Aquent, LLC is **DISMISSED WITH PREJUDICE**. It will be further **ORDERED** that **JUDGMENT** is entered for Aquent, LLC on Count II (Retaliation).

A separate Order accompanies this Memorandum Opinion.


Date: April 17, 2020                                         _____/s/_____

                                                                    Royce C. Lamberth
                                                                    United States District Court Judge